FILED BY  D.C.

NOV 05 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Thomas Houge, | Civil Action No. _____ |
| an Individual, a Connecticut resident, | |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | **Cause(s) of Action** |
| Discover Financial Services, | **1. Constitutional Violations and other Civil Wrongs** |
| an Illinois Corporation, | **2. Fraudulent Misrepresentation** |
| American International Group Inc., | **3. Breach of Contract** |
| A New York Corporation, | |
| Lexinfton Law Firm, | |
| A Utah Corporation, | |
| Assurant Inc., | |
| A New York Corporation, | |
| Experian PLC, | |
| An Ireland Corporation, | |
| Defendant, | |

## COMPLAINT

COMES NOW the Plaintiff, Thomas Houge, a Connecticut resident, (the "Plaintiff"), who sues the Defendants Discover Financial Services an Illinois Corporation, American International Group Inc., A New York Corporation Lexington Law Firm, A Utah Corporation, Assurant Inc., A New York Corporation, Experian PLC. An Ireland Corporation collectively "the Defendants") and further states as follows:

## JURISDICTION AND VENUE

Jurisdiction is proper in this case as the US District Courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. Jurisdiction is therefore proper under 28 U.S.C. § 1332.

Jurisdiction is also proper in this case as the US District Courts shall have subject-matter jurisdiction to hear a civil cases alleging violations of the United States Constitution, federal law, or a treaty to which the United States is a party. Jurisdiction is therefore proper under 28 U.S.C. § 1331.

Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the relevant period, Defendant Enterprise., resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that relate to interstate commerce occurred in this District.

## THE PLAINTIFF

Plaintiff, Thomas Houge is a an individual, who at all times preceding this action is a resident of the Connecticut but is presently and physical domiciled in the State of Florida. . In the professional world the Plaintiff serves as an Entrepreneur and also as Chief Executive Officer and CEO of Find, a well-known Tech Company, providing services throughout the continental United States and the International Community.

## THE DEFENDANTS

1.     The Defendant Discover Financial Services is an American financial services company that owns and operates Discover Bank, which offers checking and savings accounts, personal loans, home equity loans, student loans and credit cards. It also owns and operates the Discover and Pulse networks, and owns Diners Club International.

2.     The Defendant American International Group Inc. ("AIG") is a leading global insurance organization with operations in approximately 80 countries and jurisdictions. AIG provide a wide range of property casualty insurance, life insurance, retirement solutions, and other financial services to support its clients in business and in life through General Insurance, Life & Retirement and Investments business units.

3.      The Defendant Lexington Law is here to help you meet your credit score goals. Our credit repair services can help you work to remove the inaccurate or unfair negative items listed on your credit report.

4.      The Defendant Assurant Inc.  holds itself out to be  a global provider of risk management products and services with headquarters in New York City. Its businesses provide a diverse set of specialty, niche-market insurance products in the property, casualty, extended device protection, and preneed insurance sectors.

5.      The Defendant Experian PLC is an Ireland firm that offers credit and marketing services. The Company manages large databases that enable credit granting and monitoring, and help minimize fraud and credit risk, offers specialist analytical solutions for credit scoring, risk management, and processing applications, processes checks and credit cards, and offers consumers credit reports and scores.

## FACTUAL ALLEGATIONS

1.  On November 4, 2020 the Plaintiff upon invitation by  Braman Motors ("Braman"), entered Braman's business establishment in Miami FL, to engage in  pre-contractual negotiations with  Braman over the purchase of a vehicle that would be suitable for Plaintiff's needs as an Entrepreneur.

2.  The Plaintiff and Braman continued in their discussions with the with Braman eventually including BMW at Bridgeport in the conversation as Plaintiff desired a luxury style SUV; the Plaintiff and Braman eventually negotiated for the sale of a BMW X 5 vehicle worth $45,000 stated audibly that they were going to perform a soft credit check inquiry and represented further to Plaintiff that it would not affect the Plaintiff's credit upon doing so.

3.  Braman, rather than performing a soft credit inquiry, did several hard inquiries into the Plaintiff's credit which subsequently caused Plaintiff's credit score to take a down spiral, a fact discovered by the Plaintiff only after the sale of the vehicle itself..

4.  Plaintiff states that Braman used its  leverage and/or bargaining power having already performed the hard credit inquiry checks to further persuade  Plaintiff to pay more than the Plaintiff reasonably expected to pay for the vehicle, when initially negotiating for the vehicle's sale and purchase.

5. The parties then entered an agreement for the sale of the BMW x5 (the "subject vehicle") for the amount of $45,000, with Plaintiff having to pay $798.00 monthly, which was more than the Plaintiff had reasonably expected to pay per month for the vehicle; but with the hard inquiries on Plaintiff's credit initiated by Braman that the Plaintiff felt forced to enter into the sale agreement for the Subject Vehicle.

6. Plaintiff states than not more than two months from purchasing the vehicle, there became an issue concerning the vehicle involving water and the vehicle became inoperable.

7. Plaintiff then contacted BMW's road side assistance but rather than wait, the Plaintiff had the car towed to BMW at his own expense with specific instructions not to repair the vehicle, but only to provide an estimate of the costs of repair after determining the damages.

8. Plaintiff states that repairs that were later determined to be faulty, was performed on the Subject Vehicle, without Plaintiff's consent.

9. Plaintiff states that the vehicle eventually was towed to Braman at the Plaintiff's own expense, and in the vehicle, there was a check for the amount of $21,000 from State Farm insurance payable to the Plaintiff/s name, which Plaintiff had intended for other means.

10. Plaintiff states that on July 8, 2021 he entered Braman's premises in an endeavor to have the vehicle returned and Braman's agent, verbally refused to provide Plaintiff with the vehicle, the State farm check bearing his name, and also the parts which were removed from the vehicle, despite Plaintiff informing Braman not to remove or repair.

11. During Plaintiff's visit to Braman's premises, one of Braman's agents started acting belligerent and the Miami Dade County Police were contacted.

12. Upon arrival at the scene, the Plaintiff was arrested and charged for disorderly conduct, trespass and resisting arrest without violence (three misdemeanors).

13. Plaintiff asserts that in the process of Plaintiff's arrest his personal vehicle remained on Braman's premises, which Plaintiff discovered was later vandalized and relieved of its contents which included several pieces of Plaintiff's identification including his bank cards, debit cards and other personal information, inclusive of hand held devices legally belonging to the Plaintiff.

14. Plaintiff asserts that his entire identity was stolen, either by the agents of the Braman or the Miami Dade County Police Officers that more than likely searched the vehicle after his arrest.

15. Plaintiff states that while in custody, he was informed that his personal car that he was driving would be placed outside of the gate of Braman's premises and that said vehicle would be there upon his release from jail.

16. Plaintiff states that upon his release his personal vehicle was not placed outside of Braman's gate but was rather vandalized, and that further, his personal effects including his identification had been removed and/or stolen.

17. Plaintiff states that he was never able to retrieve the physical check from State Farm that was in the BMW x 5 that was for $21,000, as it had presumably been stolen by Braman.

18. Plaintiff states when he reported the check matter to his financial institution, and that Charles Schwab's response was only to provide Plaintiff with the funds in small increments, to this day, and not the full amount as Plaintiff reasonably expected. Further, Plaintiff asserts that in order to receive the funds for the check, that State Farm is obligated to liaise with the Santander Consumer USA Inc, to acknowledge the BMW X5 as a total loss (as the Plaintiff believes), thereby allowing Charles Schwab to release any holds in order to issue to Plaintiff's $21,000 check to him.

19. Plaintiff states that at the time of his release for the three misdemeanor charges that he had already spent over $4000 in towing fees, car rentals and in transportation costs such as lyft and uber, just to name a few. Further, the Plaintiff is still paying $798 for the BMW x5 that still remains in the possession of the Defendant and the issue has passed three (3) months. Further, Plaintiff states that the car is not presently in any arrears and that he neither owes the Defendant nor any of its agents, for any services.

20. Notwithstanding the above facts and allegations, Plaintiff states that upon his release from jail, that Plaintiff was provided a car by Benjamin Ferrer of Braman Motors, as a loaner, for a minimum use of thirty (30) days, but later made representations that he wanted Plaintiff to have the loaner car until the Subject Vehicle was repaired.

21. Plaintiff asserts that the car still has not been repaired and Braman continues to perpetuate lies to this day.

22. During this time, while driving in Ft. Lauderdale, the keys which Braman provided to the Plaintiff to the "loaned vehicle," suddenly became deactivated by its lender ( Braman), and the car stopped working entirely. Subsequently, Plaintiff could no longer operate said

vehicle and the Ft. Lauderdale police was contacted as they were informed that the vehicle had been purportedly stolen.

23. Plaintiff states that during his dealings with the Ft. Lauderdale police, they confiscated both the keys for the "loaned vehicle" and also the Plaintiff's personal keys in the process, as both keys had been on the same bunch.

24. Plaintiff states that he then acted reasonably and visited Braman's premises in order to obtain the replacement keys for the loaned vehicle and the Defendant Braman contacted the Miami Dade County Police a second time. Plaintiff was then arrested a second time, this time for burglary (F21-012750), which to date, Plaintiff sees no reason for said charge on his record.

25. Plaintiff spent one week in jail where he was subject to poison and other forms of unwanted embarrassment. Plaintiff further states that he was denied contact with his Attorney and also his family for the purposes of posting bail.

26. Plaintiff states that upon release, he was eventually sent the car keys which turned out to be wrong set of keys.

27. Plaintiff states that upon an independent estimate of the BMW 5 vehicle paid for by Plaintiff, the vehicle itself is reportedly a total loss based off of the initial damages to the vehicle and the reported faulty repairs and removal of parts which Plaintiff did not request to be performed on the vehicle when in Braman's possession.

28. Plaintiff states that as an entrepreneur he earns in excess of $6000 monthly and had a 758 credit score prior to Plaintiff's course of dealings with Braman.

29. Plaintiff states that he has lost over $20,000 in out of pocket expenses alone in lyfts, Uber and towing fees etc...and continues to be billed $798 monthly for a vehicle that is not in his possession.

30. Plaintiff states that because of the identity theft issues which emanated because of Plaintiff's course of dealings which Braman, that the Plaintiff's remittance of the $21,000 State Farm insurance check in his name is being delayed with his financial institution, Charles Schwab.

31. Plaintiff reiterates that the Subject Vehicle is a total loss and in the possession of A+ Auto Collision Center LLC, which Company refuses to even allow Plaintiff to view the vehicle.

**Facts relating to the Defendants**

32. Plaintiff states that his credit, his business, his earning capacity, his identity and his reputation as a law abiding businessman has all been destroyed because of the above stated occurrences.

33. Plaintiff further states that at all times preceding this action, that he has had Identity Theft Protection coverage Insurance with the Defendant AIG in the amount of $100,000.00 and that AIG to date has failed to honor Plaintiff's legitimate claims to his identity being stolen be either agents working for Braman or the Miami Dade County Police Officers who searched Plaintiff's personal car on Braman's Premises before arresting him.

34. Plaintiff further states that at all times preceding this action, that he has had Identity Theft Protection coverage Insurance with the Defendant Discover I in the amount of $100,000.00 and to date has failed to honor Plaintiff's legitimate claims to his identity being stolen be either agents working for Braman or the Miami Dade County Police Officers who searched Plaintiff's personal car on Braman's Premises before arresting him.

35. Plaintiff further states that at all times preceding this action, that he has had Identity Theft Protection coverage Insurance with the Defendant Lexington Law in the amount of $100,000.00 and to date has failed to honor Plaintiff's legitimate claims to his identity being stolen be either agents working for Braman or the Miami Dade County Police Officers who searched Plaintiff's personal car on Braman's Premises before arresting him.

36. Plaintiff further states that the Defendant Lexington Law Firm has also refused to reinstate Plaintiff's impeccable credit score of 750 despite Plaintiff's plight that his identity was legitimately stolen.

37. Plaintiff further states that at all times preceding this action, that he has had Identity Theft Protection coverage Insurance with the Defendant Assurant Inc. in the amount of $100,000.00 and to date has failed to honor Plaintiff's legitimate claims to his identity being stolen be either agents working for Braman or the Miami Dade County Police Officers who searched Plaintiff's personal car on Braman's Premises before arresting him.

38. Plaintiff further states that at all times preceding this action, that he has had Identity Theft Protection coverage Insurance with the Defendant Experian PLC in the amount of $100,000.00 and to date has failed to honor Plaintiff's legitimate claims to his identity being stolen be either agents working for Braman or the Miami Dade County Police Officers who searched Plaintiff's personal car on Braman's Premises before arresting him.

39. Plaintiff further states that the Defendant Experian PLC has also refused to reinstate Plaintiff's impeccable credit score of 750 despite Plaintiff's plight that his identity was legitimately stolen.

40. Plaintiff states that while no amount of money can compensate for the Plaintiff's losses suffered as a result of losing his identity, that he seeks damages against all the Defendants in the total amount of $500,000,000 representing the lost insurance coverage which Defendants have refused to honor.

41. Plaintiff as grounds for asserting such damages, and as causes of action the Defendant Braman, further states as follows:

**FIRST CAUSE OF ACTION**

**Constitutional Violations and other Civil Wrongs As Against all Defendants**

The Supreme Court's plainest description of a cause of action came in Davis v. Passman. 442 US 228 (1979). In that case, Shirley Davis sought damages from Representative Otto Passman for a violation of her right to equal protection under the Fifth and Fourteenth Amendments. Id. at 230–31, 242. Id. at 230–31, 242. As part of its analysis, the Court defined the concept itself. A cause of action exists, the Court explained, if the "plaintiff is a member  of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." With the ability "to invoke the power of the court," Davis also makes clear that there are two ways to create a cause of action.

First, Congress might create one itself. In enacting a statute, Congress might bestow on those who are injured by the violation of the statute the power to seek relief from the wrongdoer. However, Congress can create causes of action for reasons other than to enforce statutory violations. Congress is free to create them in the constitutional realm as well, as it did with the so-called § 1983 action.  Nevertheless, if Congress does not create a cause of action, the federal courts may do so. Such causes of action are known as "implied causes of action" Id. because the mere existence of a right implies, in some sense, their existence. Although Davis is only a single case, both courts and scholars have frequently relied upon its formulation of the cause of action. Moreover, neither courts nor scholars have ever discredited the formulation.

Further, a judicially created cause of action often relates closely to rights. When federal courts are faced with the question of whether to create a cause of action, they often look for the cause within the right itself. Federal courts have found a cause of action to enforce one's due

process rights "implicit in the Fifth Amendment" or to enforce one's right to humane treatment in prison "implied . . . from the Eighth Amendment." Id.

In sum In determining whether to imply a cause of action, the federal courts look to "congressional intent to provide a private remedy." Similarly, the availability of a cause of action often turns on the nature of the remedy sought. See. Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1102 (1991)).

Plaintiff in light of the foregoing asserts that the Defendants should be held liable according for predicating violations of Plaintiff's constitutional rights under the fifth and fourteenth amendments to the US Constitution. Plaintiff asserts and requests that the Court note, that while no amount of money can fully compensate Plaintiff for his loss of identity, business reputation, impeccable criminal record, loss of future sales and future earning capacity, as damages in the amount of $1,000,000.00 against each Defendant for their respective constitutional violations/civil wrongs in flagrantly denying Plaintiff his identity theft insurance coverage due to him, when it was reported that Plaintiff had lost his identity. Plaintiff claims total damages as Against all Defendants in the amount of $8,000,000.00.

## SECOND CAUSE OF ACTION - FRAUDULENT MISREPRESENTATION
### As Against all Defendants

The Florida Supreme Court has stated that the required elements of a cause of action for fraudulent misrepresentation are:

> 1) a false statement concerning a material fact;
>
> 2) the representer's knowledge that the representation is false;
>
> 3) an intention that the representation induce another to act on it; and
>
> 4) consequent injury by the party acting in reliance on the representation. *Johnson v. Davis,* 480 So. 2d 625, 627 (Fla.1985).

Plaintiff asserts that:

The Defendants acting independent of each other made:

1) a false statement concerning a material fact, when Defendants communicated to Plaintiff through their terms and conditions that he would be entitled to identity theft coverage Insurance if in fact he lost his identity.

2) the representer's knowledge that the representation is false;

Plaintiff states that Defendant  knew that their statements were false since they did the exact opposite to what they represented to Plaintiff by to date, not honoring Plaintiff's claim.

3) an intention that the representation induce another to act on it;

Plaintiff states that the Defendants' intentions in using false representations to induce Plaintiff to purchase its services was clear  as the Defendants use the idea of honoring insurance claims as a means to entice the Plaintiff all despite their representations to Plaintiff that they would honor his coverage in the event that Plaintiff's identity was stolen.

 4) consequent injury by the party acting in reliance on the representation.

 Plaintiff states that because of the Defendant's  representation to Plaintiff which was later revealed to be false, that the Plaintiff suffered damages in the loss of his identity and to date, each Defendant has a $1,000,000.00 identity theft insurance policy with Plaintiff and none of the within-named Defendants have made any steps towards compensating Plaintiff, all to his detriment as Plaintiff expected to receive the identity theft insurance coverage which he signed for when first contracting with the Defendants and using their services. Plaintiff as to this cause of action claims damages in the amount of $1,000,000.00 from each Defendant listed. Plaintiff asserts total damages in the amount of $5,000,000.00 for the Defendants' fraudulent misrepresentation towards Plaintiff.

### THIRD CAUSE OF ACTION - BREACH OF CONTRACT
### As Against all Defendants

   An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages. *Friedman v. New York Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008). This general rule was enunciated by various Florida district courts of appeal. See *Murciano v. Garcia*, 958 So.2d 423, 423-24 (Fla. 3d DCA 2007); *Abbott Laboratories, Inc. v. General Elec. Capital*, 765 So.2d 737, 740 (Fla. 5th DCA 2000); *Mettler, Inc.  v. Ellen Tracy, Inc.*, 648 So.2d 253, 255 (Fla. 2d DCA 1994); *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). To maintain an action for breach of contract, a claimant must first establish performance on the claimant's part of the contractual obligations imposed by the contract. *Marshall Construction, Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So.2d 845, 848 (Fla. 1st DCA 1990)."

   In light of the foregoing, Plaintiff requests that the Court, at the very least, award Plaintiff damages for breach of contract in the amount of $5,000,000.00, representing the entire cost of the coverage that he was denied. Plaintiff states each Defendant had a duty to compensate Plaintiff

according to its own policy in the amount of $1,000,000.00 and each Defendant have to date reneged on their promise, according to its terms and policies, to do so. Plaintiff has obtained no real benefit from the insurance coverage which was promised to him in the event he lost his identity and since this event did in fact occur, Plaintiff demands the full cost of the coverage that he is entitled. Plaintiff for his entire losses, under this cause of action, seeks damages in the amount of $5,000,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1.  Award Plaintiff damages against all each Defendant for their respective constitutional violations and/or civil wrongs in the amount of $5,000,000.00.

2.  Notwithstanding the above claim for damages, Award Plaintiff damages as against all Defendant for fraudulent misrepresentation in the amount $5,000,000.00.

3.  Notwithstanding the above claim for damages, Award Plaintiff damages against all the Defendants for breach of contract in the amount of $5,000,000.00.

4.  Plaintiff also asserts damages against the Defendants for an additional $3,000,000.00 as special damages for the Defendants collective delay in rectifying Plaintiff's identity theft issue, which continues to cause Plaintiff significant losses daily.

Plaintiff asserts total damages in the amount of $8,000,000.00.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated: 10/4/2021

Respectfully Submitted,

Thomas Houge
Plaintiff, Pro Se
FindTravelers@pm.me
757 SE 17th Street, #1087
Ft. Lauderdale, FL 33316



#1087
E, FL 33316

USDC, SOUTHERN DISTRICT
299 EAST BROWARD BLVD.
ROOM 108
FORT LAUDERDALE, FL 33301

THOMAS HOUGE
(203) 572-3360
THE UPS STORE #0896
757 SE 17TH ST
FORT LAUDERDALE  FL 33316-2954

0.3 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 04 NOV 2021

SHIP USDC SOUTHERN DISTRICT
TO:  STE 108
     299 E BROWARD BLVD

FORT LAUDERDALE  FL 33301-1922

FL 333 0-04

UPS NEXT DAY AIR          1
TRACKING #: 1Z 378 137 01 3548 9664

BILLING: P/P

ISH 13.80F ZZP 450 41.5V 10/2021

FILED BY_____ D.C.

NOV - 5 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

USDC SOUTHERN DISTRICT
299 E BROWARD BLVD
STE 108
FORT LAUDERDALE FL 33301

P:BLUE   S:RIGHT  I 51D

45-1314

1Z378137013548 9664    1030

SAT08485 Nov  5 04:24:53 2021
US 3330 HIPPS 21.9.0 SAT08485sL

Print & Business Services.

istore.com to learn more

UPS Worldwide Expedited®
UPS 3 Day Select®
UPS Standard
UPS Ground

Do not use this envelope for:

Apply shipping documents on this side.

UPS 2nd Day Air®
UPS Worldwide Express℠
UPS Next Day Air®   This envelope is for use with the following services: